E-FILED on 3/27/13

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM VASQUEZ MARTINEZ, ) | No. C 08-5232 RMW (PR) |
| )  Petitioner, ) | |
| ) | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY |
| v. ) | |
| ) | |
| MIKE MCDONALD, Warden, ) | |
| ) | |
| Respondent. ) | |
| ─────────────────────────── ) | |

Petitioner, a state prisoner proceeding pro se, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his state conviction and judgment. On November 17, 2011, the court granted respondent's motion to dismiss several claims as unexhausted, and ordered respondent to show cause why the petition should not be granted as to the remaining two claims. Respondent has filed an answer addressing the merits of the petition, and petitioner has filed a traverse. Having reviewed the briefs and the underlying record, the court concludes that petitioner is not entitled to relief based on the claims presented and DENIES the petition.

**BACKGROUND**

The following statement of facts is taken from the California Court of Appeal's opinion. (Resp. Ex. E.)

> Defendant was charged by first amended information, along with Isaac Rene Marquez, with one count of attempted premeditated murder (§§ 664, subd. (a), 187, 189; count 1), and three counts of assault with a deadly weapon (§ 245, subd. (a)(1); counts 2-4). The information further alleged that defendant personally used a deadly and dangerous weapon during the commission of all four offenses, to wit, a knife during the commission of counts 1 through 3, and an automobile during the commission of count 4 (§§ 12022, subd. (b)(1), 1192.7;

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.Rmw\HC.08\Martinez232denhc.wpd

and that all the offenses were committed for the benefit of, or in association with, a criminal street gang (§ 186.22, subd. (b)(1)).

Pursuant to section 1538.5, defendant filed a motion to suppress evidence, observations, and the fruits thereof, relating to a search and seizure by police officers on June 12, 2003, the day of the alleged offenses. The People filed opposition to the motion. Following a hearing, the trial court denied the motion on April 7, 2004.

On October 28, 2004, defendant filed a motion to dismiss the information, arguing that the vehicle used by the complaining witness on the date of the alleged offenses was material evidence that the prosecution failed to preserve. Following a hearing, the court denied the motion on November 3, 2004. On the same day, the court granted Marquez's motion to dismiss the charges against him pursuant to section 1382.

**A.     The Prosecution's Case**

1.     The June 12, 2003 incident

Sometime around noon on June 12, 2003, Martin Franco [FN2] was driving a white Subaru on King Road with Rigoberto Martinez Vasquez [FN3] in the passenger seat. A white Suzuki driven by defendant and with another male as a passenger pulled up beside the Subaru. Franco saw the passenger make a Norteno-gang hand signal, showing four fingers, and he heard the derogatory term "scrap" being yelled. Franco, who used to be a member of a Sureno gang, and who has gang tattoos, "flipped them" and accelerated, but the Suzuki followed him and repeatedly bumped into the sides and the rear of the Subaru. The Subaru also hit the Suzuki once when the Suzuki blocked its exit from a parking lot.

> FN2. Franco testified that he has prior convictions for giving a false name to police.
>
> FN3. Vasquez testified that he has prior convictions for auto burglary, giving a false name to police, and misdemeanor reckless driving. He was deported and he returned to this country without permission.

Franco turned on Story Road and had to stop behind traffic at the light at Story and McLaughlin. While Franco was stopped, the Suzuki rammed the Subaru from the rear, causing it to hit a truck in front of it. Franco got out of the Subaru and ran across the street when he saw defendant get out of the Suzuki with a knife in his hand and start to follow him. Looking back, Franco saw the passenger get out of the Suzuki with a knife in his hand and run to the passenger side of the Subaru. Franco saw Vasquez trying to take off his seatbelt inside the Subaru, and then saw defendant return to help defendant's passenger. Franco ran to a nearby public phone and called the police. The police arrived about 10 to 15 minutes later. The next time Franco saw Vasquez, he was in an ambulance and unconscious.

Vasquez received stab wounds to his left chest, his left hand, his right leg, and two places on his left leg. He was still inside the Subaru when he was stabbed. He kicked at the stabber, causing the stabber to fall, and then he ran. He heard the Suzuki driver yell at the stabber to chase after him. Vasquez ran to a store and the store owner helped him call the police. The police and an

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.Rmw\HC.08\Martinez232denhc.wpd          2

ambulance came. Vasquez lied to the police and told them that he had been at a bus stop. He eventually passed out. Vasquez identified Marquez at trial as the stabber.

. . .

The parties stipulated that the Suzuki was seized by San Jose police at 10:00 p.m. on June 12, 2003, at 567 South 8th Street in San Jose, and that on that date Marquez lived at 447 South 7th Street. The parties further stipulated that the Suzuki is owned by defendant's girlfriend. Fingerprints taken by police from the inside window of the driver's door of the Suzuki matched defendant's prints. Paint chips taken from the Subaru and Suzuki indicate that the Subaru and Suzuki very likely came in contact with each other. The police found a blue bandana inside the glove compartment and a red baseball cap on the driver's seat of the Suzuki.

      2.      The gang evidence

San Jose Police Detective Nicholas Speaks testified as an expert in Hispanic criminal street gangs. Norteno gang members identify with the color red, and the number 14. Sureno gang members associate with the color blue and the number 13. One of the primary activities of Norteno gangs is to assault Sureno gang members, who are their rivals. When challenging Sureno gang members, Norteno gang members will commonly display four fingers. On June 6, 2002, a validated Norteno gang member, along with eight to ten others, several of them wearing red, severely beat a victim perceived to be a Sureno gang member. On October 17, 1997, two Norteno gang members, along with several others, threw items at a Sureno gang member outside the victim's home, which was in Norteno gang territory. The victim was hit in the head with a brick, and the group fled when the victim was able to get inside his home and the victim's mother started to come outside.

Detective Speaks further testified that, in his opinion, Marquez and defendant are Norteno gang members, and that the stabbing on June 12, 2003, was committed in association with, and for the benefit of, a Norteno street gang. Marquez has been associated with a Norteno gang, he frequents the gang territory, he has been contacted by police while with validated Norteno gang members, and he has participated in crimes against Sureno gang members. He has Norteno gang tattoos and he was wearing a red 49er's jersey when he was stopped by police on June 12, 2003. Defendant has associated with validated Norteno gang members while wearing red clothing, he has Norteno gang tattoos, he has admitted to officers and CYA staff that he is a Norteno gang member, and he has participated in group attacks by Norteno gang members on Sureno gang members. Franco was a validated Sureno gang member and Vasquez is a Sureno gang associate. Defendant and Marquez displayed a Norteno gang sign and yelled an insult to Sureno gang members on June 12, 2003; Franco admitted that he "flip[ped] off" the Norteno gang members, which is a direct insult that cannot go unchallenged; and the two cars hit and sideswiped each other during the incident.

**B.      The Defense Case**

Detective Speaks testified that defendant has not admitted being a member of a Norteno gang, and no Norteno gang member has ever stated that defendant belongs to his gang. Defendant participated in a gang renunciation program at

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.Rmw\HC.08\Martinez232denhc.wpd          3

CYA to have gang tattoos removed, but defendant also participated in a gang-related attack at CYA following his involvement in that program. The detective was not aware of any evidence that any of the men involved in the June 12, 2003 incident knew each other prior to that incident.

Robert Lindskog testified as an expert in accident reconstruction that, in his opinion, based upon his examination of the Suzuki and photographs of the Subaru, the Subaru steered into the side of the Suzuki. The Suzuki also received damage to its rear bumper from the side, but the damage was not caused by being rear-ended by the Subaru. The Subaru received damage to its rear bumper but not to its front bumper, and the damage to its rear bumper was not caused by being rear-ended by the Suzuki, unless it was rear-ended at a very low speed.

Dr. Richard Kline testified that he treated Vasquez at San Jose Medical Center for stab wounds on the afternoon of June 12, 2003. Vasquez's chest wound and right leg wounds were superficial, and he was awake and alert. After treatment, all of his wounds were non-life-threatening. However, the laceration to his left hand severed the tendon of a finger, resulting in his inability to flex that finger and requiring surgery.

### C.     Rebuttal Evidence

Detective Speaks testified that the distance the Subaru traveled from the first confrontation to where it stopped at Story and McLaughlin is one mile. In that stretch of road, there are several intersections or exits a driver could take.

San Jose Police Officer Kevin Cassidy testified as an expert in accident reconstruction that, in his opinion after having examined the Suzuki and photos of the Subaru, the damage to the rear bumper of the Suzuki was caused by a sideswiping collision and not a rear-end collision. However, it is possible that the Subaru rear-ended the Suzuki. It appears that the Subaru was rear-ended by a vehicle going about 15 miles per hour, and that the right front damage to the Subaru was caused by contact with the left front of the Suzuki while the Subaru was going faster than the Suzuki.

### D.     The Verdicts and Sentencing

On December 2, 2004, the jury found defendant guilty of attempted premeditated murder (§§ 664, subd. (a), 187, 189), and two counts of assault with a deadly weapon (§ 245, subd. (a)(1)). The jury further found that defendant personally used a deadly or dangerous weapon during the commission of the offenses, to wit, a knife during the attempted murder and one assault, and an automobile during the other assault (§§ 12022, subd. (b)(1), 1192.7); and that all the offenses were committed for the benefit of, or in association with, a criminal street gang (§ 186.22, subd. (b)(1)). The jury found defendant not guilty of a third count of assault with a deadly weapon.

On June 29, 2005, defendant filed a motion for new trial. On October 6, 2005, the trial court denied the motion for new trial and sentenced defendant to the indeterminate term of 15 years to life, consecutive to the determinate term of one year.

(Resp. Ex. E at 1-7.)

**DISCUSSION**

A.   Standard of Review

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S .C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, Williams v. Taylor, 529 U.S. 362, 384-86 (2000), while the second prong applies to decisions based on factual determinations, Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if the state court correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El, 537 U.S. at 340. In determining whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established

federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir. 2000). Here, that decision is the California Court of Appeal.

B.  Petitioner's Claims

As grounds for federal habeas relief petitioner claims that: (1) the prosecution violated petitioner's right to due process by failing to preserve the victims' vehicle, i.e., the Subaru, and (2) the trial court violated petitioner's right to due process by giving jury instruction CALJIC 3.02.

1.  Failure to preserve

Petitioner claims that the prosecution failed to preserve the Subaru until defense counsel had an opportunity to have an expert examine it for measurements of exact scratches, depths, and angles of impact, and determine if there were any paint transfers from petitioner's car to the Subaru. (Pet. at 14-15.) Petitioner argues that, had defense counsel had the opportunity to examine the Subaru, it might have bolstered his theory that the Subaru was the aggressor vehicle, and the crimes were a result of road rage, rather than a product of gang activity. The California Court of Appeal summarized the relevant facts below.

> One officer took 84 photos in the case, including photos of Vasquez, the Subaru and the Suzuki at the scene on June 12, 2003, the day of the stabbing incident and defendant's arrest. The photos of the Subaru included ones of its interior and all four exterior sides. The officer also took samples of paint from the right front of the Subaru, where all the major damage was, including a control sample and possible transfer samples. The car was towed to the police garage, a secure facility, the same day. There, the Subaru was processed by a crime scene investigator who took additional photos and fingerprint and blood samples.
>
> The Subaru was released on August 6, 2003, in order to free up space at the police garage. Prior to that time, neither the police nor the District Attorney had received a request from the defense to preserve the Subaru. The Suzuki remained in police custody.
>
> On April 8, 2004, defense counsel informed the court that it was her "intention . . . to possibly retain an accident reconstruction expert, or at least a collision expert," who would need to obtain exact measurements of the alleged sideswiping damage to the Subaru in order "to try to ascertain the angles of impact." However, counsel learned the day before that the Subaru had been released. Thus, she requested that the court order the prosecution to make the car available for inspection. The prosecutor informed the court that he had just learned that week that defendant wanted to inspect the Subaru. Prior to that time, he had officers attempt to locate the car for him but the victims no longer owned it. He stated that the prosecution intended to use the photographs of the Subaru as well as the paint samples, and that the condition of the Subaru could be very different now than it was in June 2003.

> . . . On October 28, 2004, counsel filed a motion to dismiss the information, contending that the prosecution's failure to preserve the Subaru as an item of material evidence pursuant to California v. Trombetta (1984) 467 U.S. 479, required the dismissal. Defendant's contention was based on his claim that the Suzuki was initially struck from behind by the Subaru and that he could no longer analyze whether paint was transferred from the rear of the Suzuki to the front of the Subaru. At the hearing on the motion on November 3, 2004, defense counsel informed the court that, based on an examination of the Suzuki and the photos of the Subaru, the defense expert was prepared to testify that "the Subaru was the aggressor vehicle, and the Suzuki was the victim vehicle," but that counsel hoped "to do a complete and thorough investigation." The court denied the motion because there "really wasn't any willful effort by law enforcement to suppress evidence that would be of an exculpatory value to the defendant."
>
> Defendant now contends that the prosecution's failure to preserve the Subaru violated his right to due process. He argues that preservation of the exculpatory value of the Subaru was apparent before it was released, and that it was also apparent that defendant could not obtain comparable evidence by other means. Thus, the release of the Subaru was in bad faith.

(Resp. Ex. E at 27-28.)

As the state appellate court identified in its opinion, the government has a duty under due process to preserve material evidence, i.e., evidence whose exculpatory value was apparent before it was destroyed and that is of such a nature that the defendant cannot obtain comparable evidence by other reasonably available means. See California v. Trombetta, 467 U.S. 479, 489 (1984); Grisby v. Blodgett, 130 F.3d 365, 371 (9th Cir. 1997). The exculpatory value of the evidence must be "apparent"; the mere possibility that evidence could have exculpated a defendant if preserved is insufficient to satisfy the standard of constitutional materiality in Trombetta. Arizona v. Youngblood, 488 U.S. 51, 56 n.* (1988). In addition, a petitioner must show bad faith on the part of the police in destroying the evidence. "Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Id. at 58. "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." Id. at 56 n.* (citations omitted).

The state appellate court reasonably determined that petitioner's due process rights were not violated. First, as there is no evidence about whether there were any paint samples present from the Suzuki to be taken from the rear of the Subaru, it is unclear whether the Subaru had (or to what degree it had) apparent exculpatory value before it was destroyed. See Youngblood, 488 U.S. at 56,

n.* (concluding that the possibility that semen samples could have exculpated respondent if they were preserved or tested is insufficient to satisfy Trombetta) (emphasis added). Second, petitioner has not made any showing that the police or the prosecutor acted in bad faith, i.e., that they knew of the exculpatory value of the evidence and destroyed it all the same. Petitioner's arguments that the police should have known the Subaru was needed to potentially support a possible defense theory is insufficient to demonstrate that the exculpatory value was apparent. See id. (finding that respondent failed to demonstrate that the police knew that the semen samples would have exculpated him when they failed to perform tests or refrigerate the evidence). Because the record contains ample evidence that no constitutional violation occurred, the state appellate court's decision was reasonable, and therefore is entitled to AEDPA deference.

    2.       CALJIC 3.02

Petitioner claims that jury instruction CALJIC 3.02 violated his right to due process because its "natural and probable consequences" language created a non-rebuttable presumption, and allowed the jury to convict petitioner of attempted murder without having to find that the petitioner had the requisite specific intent.

At trial, and over defense counsel's objection, the trial court instructed the jury as follows:

> "One who aids and abets another in the commission of a crime is not only guilty of those crimes, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crimes originally aided and abetted. [¶] Now, in order to find the defendant in this case, William Martinez, guilty of the crime of attempted murder and also the enhancements alleged, this was done willfully and deliberately and premeditated[, i]n the offenses in count one, you must be satisfied beyond a reasonable doubt that 1) the crimes of assault were committed; 2) the defendant aided and abetted in those crimes; and 3) that a co-principal in that crime committed the crime of attempted murder, and that the crimes of attempted murder and the enhancements, that was done willfully, deliberately and with premeditation[,] were a natural and probable consequence of the commission of the crime of assault. [¶] Now, in determining whether the consequence is 'natural and probable' you must apply an objective test, based not on what the defendant actually intended, or [sic] what a person of reasonable and ordinary prudence would have expected likely to occur. The issue is to be decided in light of all of circumstances surrounding the incident. A 'natural' consequence is one which is within the normal range of outcomes that may reasonably be expected to occur if nothing unusual has intervened. 'Probable' means likely to happen. [¶] You are not required to unanimously agree as to which originally contemplated the crime, the defendant aided and abetted, so long as you're satisfied beyond a reasonable doubt and unanimously agree that the defendant aided and abetted the commission of an identified and defined target crime and that the crime of attempted murder was a natural and probable consequence of the commission of that target crime."

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.Rmw\HC.08\Martinez232denhc.wpd      8

(Resp. Ex. E at 32.)

The state appellate court relied upon state law and rejected petitioner's claim as follows:

> Our Supreme Court has previously rejected defendant's arguments in People v. Coffman and Marlow (2004) 34 Cal. 4th 1, 106-108. Under the natural and probable consequences doctrine, "an aider and abettor 'is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets.'" (Id. at pp. 106-107.) "We agree with the . . . court [in People v. Nguyen (1993) 21 Cal. App. 4th 518, 535,] that CALJIC No. 3.02 correctly instructs the jury on the natural and probable consequences doctrine. To the extent [the defendant] contends that imposition of liability for murder on an aider and abettor under this doctrine violates due process by substituting a presumption for, or otherwise excusing, proof of the required mental state, [he or] she is mistaken." (People v. Coffman and Marlow, supra, 34 Cal. 4th at p. 107.) "Finally, we reject the premise of [the defendant's] argument that the application of the natural and probable consequences doctrine in capital cases unconstitutionally predicates murder liability on mere negligence. Liability as an aider and abettor requires knowledge that the perpetrator intends to commit a criminal act together with the intent to encourage or facilitate such act; in a case in which an offense that the perpetrator actually commits is different from the originally intended crime, the natural and probable consequences doctrine limits liability to those offense that are reasonably foreseeable consequences of the act originally aided and abetted. (See People v. Nguyen, supra, 21 Cal. App. 4th at p. 531.)" (People v. Coffman and Marlow, supra, 34 Cal. 4th at p. 108.) We are bound by our Supreme Court's opinion. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal. 2d 450, 455.)
>
> Defendant seeks to distinguish his case from that in Coffman and Marlow. He argues that, in that case, the jury also found true special circumstances allegations, so it necessarily found that the defendant possessed the intent to kill. (See People v. Coffman and Marlow, supra, 34 Cal. 4th at p. 108.) However, the Supreme Court did not hold that such a finding was necessary when it rejected the defendant's arguments in that case. (Ibid.) Accordingly, we reject defendant's attempt here to distinguish his case from Coffman and Marlow.

(Resp. Ex. E at 33-34.)

The Due Process Clause of the Fourteenth Amendment protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he or she is charged. In re Winship, 397 U.S. 358, 364 (1970). This constitutional principle prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime. See Yates v. Evatt, 500 U.S. 391, 400-03 (1991).

CALJIC 3.02 correctly stated California law on the intent requirement for aiding and abetting liability under the natural and probable consequences doctrine. See People v. Coffman and Marlow, 34 Cal. 4th at 1, 106-08 (2004). The California Court of Appeal's finding is entitled to deference in

this habeas proceeding. See Bradshaw v. Richey, 564 U.S. 74, 76 (2005) (per curiam) ("a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus").

The Ninth Circuit has rejected arguments similar to petitioner's, and concluded that CALJIC 3.02 does not violate due process. See, e.g., Mendoza v. Runnels, No. 05-55736, 2007 WL 3022103, at **2 (9th Cir. Oct. 17, 2007) (unpublished memorandum disposition) (relying on clearly established Supreme Court law and affirming the denial of a Section 2254 due process claim regarding CALJIC 3.02); Solis v. Garcia, 219 F.3d 922, 926-927 (9th Cir. 2000) (Winship rule not violated where jury was given instructions on liability under the natural and probable consequences doctrine that included all elements of second degree murder, even though jury was not given instructions on the target crime of second degree murder which defendant allegedly committed as an aider and abettor); Spivey v. Rocha, 194 F.3d 971, 976-77 (9th Cir. 1999) (rejecting petitioner's claim that CALJIC No. 3.02 relieved the prosecution of its burden of proving, beyond a reasonable doubt, that petitioner had the requisite mental state to satisfy the elements of the crime of second degree murder, including malice aforethought); Windham v. Merkle, 163 F.3d 1092, 1104 (9th Cir. 1998) (rejecting argument that natural and probable consequences doctrine set forth in CALJIC 3.02 creates a mandatory presumption in violation of Sandstrom).

Significantly, petitioner cites no clearly established Supreme Court precedent undermining the validity of California's natural and probable consequences doctrine on the basis that it fails to provide for a separate assessment of the aider and abettor's intent vis-a-vis the resulting crime, i.e., attempted murder, as opposed to the assessment required of his intent as to the target crime, i.e., assault. This court is unaware of any such precedent. Further, the trial court's instructions were correct under California law, and there was no reasonable likelihood that the jury applied them in a way that violated the Constitution. See Solis, 219 F.3d at 928. As there is no clearly established federal law supporting this argument, the state court's rejection of this claim cannot be contrary to, or an unreasonable application of, clearly established Supreme Court precedent. See Carey v. Musladin, 549 U.S. 70, 77 (2006).

## CONCLUSION

The petition for a writ of habeas corpus is DENIED.

1   The federal rules governing habeas cases brought by state prisoners require a district court
2   that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling.
3   Petitioner has failed to make a substantial showing that his claims amounted to a denial of his
4   constitutional rights, or demonstrate that a reasonable jurist would find the denial of his claims
5   debatable or wrong.  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  Accordingly, a COA is
6   DENIED.
7       The clerk shall enter judgment and close the file.

**IT IS SO ORDERED.**
8   DATED: _____        _____
9                                         RONALD M. WHYTE
                                          United States District Judge

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
G:\PRO-SE\SJ.Rmw\HC.08\Martinez232denhc.wpd       11

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM VASQUEZ MARTINEZ,<br><br>    Plaintiff,<br><br>  v.<br><br>MIKE MCDONALD et al,<br><br>    Defendant. | Case Number: CV08-05232 RMW<br><br>**CERTIFICATE OF SERVICE** |

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on March 27, 2013, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

William Vasquez Martinez F00355
Pelican Bay State Prison
Housing D5-207
P.O. Box 7500
Crescent City, CA 95532

Dated: March 27, 2013

Richard W. Wieking, Clerk
By: Jackie Lynn Garcia, Deputy Clerk